UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

THOMAS PRATT,

                Petitioner,               **DECISION AND ORDER**
                                               No. 02-CV-6278

     -vs-

UPSTATE CORRECTIONAL FACILITY,

                Respondent.
_____

## INTRODUCTION

Petitioner Thomas Pratt ("Pratt") filed this *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 challenging his conviction in Monroe County Court on charges of

second degree (depraved indifference) murder and third degree criminal possession of a weapon.

The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C.

§ 636(c).

## FACTUAL BACKGROUND

The conviction here at issue stems from the fatal shooting of Joshua Ezell ("Ezell") at

about 9:25 p.m. on July 22, 1997, on Hayward Avenue in the City of Rochester. Ezell was shot

twice, once in his left forearm with a .25-caliber bullet, and once in the chest with a 9-mm bullet.

T.435. The 9-mm bullet pierced his aorta and caused his death on the scene.

Fifty-seven-year-old Jesse Hudson ("Hudson") witnessed the shooting from his house at

372 Hayward Avenue. That evening, Hudson told the police that he saw Ezell fighting with a

man whom he knew from the neighborhood as "Fruit" (*i.e.*, Pratt) and another individual in front

of 378 Hayward Avenue, and that during the altercation, Pratt shot Ezell at close range.

At 2:20 a.m. on the morning of July 23, 1997, Pratt appeared in the emergency room at Millard Fillmore Hospital, located about 60 miles away in Amherst, New York, for treatment of a gunshot wound to his shoulder. T.515-516.[1] Pratt, who was accompanied by Melissa Pearce ("Pearce") and Edward Washington ("Washington"), identified himself using a false name ("Howard Washington") and address (Utica, New York). Pratt explained that he had been shot when he flagged someone down on the highway on the way home from Niagara Falls to ask for directions. After hearing this suspicious story, hospital staff called the police, who soon discovered Pratt's real identity. Following minor surgery to remove a .25-caliber bullet from his shoulder, Pratt was transported to the police station in Clarence, New York, where he was later picked up by Rochester police and charged in connection with Ezell's shooting.

Originally, Pratt was charged by felony complaint with manslaughter in the first degree. He chose to waive immunity and testify before the grand jury, beginning his testimony with the following statement:

> My name is Thomas Pratt. I live at 52 Fourth Street. I work at Molding Corporation full-time. It was July 22nd, and I was at my girlfriend Latisha Douglas' house visiting. As I was visiting she wanted to walk to the store. She went to the store. As she was coming back to from [*sic*] the store she stopped to talk to her friend. As she was talking to her friend a guy approached her. As the guy approached her I stepped off my porch, I wanted to see what was the problem. As I walked toward the problem [*sic*] I asked the guy to let her go home. He said "no, I'm going to kill the B. I'm going to kill the B." So I stepped in the middle. He pulls out his gun and pushes my girlfriend. He shot, I grabbed him, we struggled and we just struggled and I heard another shot. And as we were struggling, as far as I fell, my girlfriend got me up, she took me home. So that's all I have to say.

---

[1]  Citations to "T.___" refer to the trial transcript.

Record on Appeal ("A.") at 92-93 (attached as pp. 184-185 of Appendix ("App.") E to

Respondent's Answer ("Resp't Ans.") (Docket #21). On cross-examination, Pratt testified that

his girlfriend, Latisha Douglas ("Douglas"), lived at 366 Hayward Avenue. He stated that neither

he nor Douglas was carrying a weapon that night, and that Douglas was carrying a radio in one

hand a bottle of soda in the other. Pratt further explained that Ezell pulled out a gun when Pratt

stepped in between him and Douglas, which precipitated the struggle between the two men. Pratt

did not recall in which hand Ezell held the gun. A.115, attached as p. 207 of App. E to Resp't

Ans. (Docket #21). Pratt testified that after the second shot was fired, both he and Ezell fell to the

ground. However, Pratt did not know whether Ezell had been shot. A.125, attached as p. 217 of

App. E  to Resp't Ans. (Docket #21). According to Pratt, he laid on the ground for three to five

minutes before Douglas helped him up and took him to her house. A.125-26 (attached as pp.

217-218 of App. E to Resp't Ans. (Docket #21).

Upon further questioning, Pratt informed the grand jury that Pearce arrived at Douglas's

house about ten minutes later and picked Pratt up in her car. Douglas remained at home,

however. Pearce then picked up Pratt's cousin, Washington, and the trio drove to a hospital near

Buffalo. When asked why he did not go to a hospital in Rochester, Pratt replied, "Because I was

scared. She [Pearce] said she heard that my girlfriend [Douglas] was involved in the shooting,

that she did the shooting and I was trying to protect my girlfriend and I was scared." A.134

attached as p. 226 of App. E to Resp't Ans. (Docket #21).

Pratt acknowledged that Douglas had done nothing wrong but stated that he went to

Buffalo anyway because Pearce suggested he do so. (Indeed, according to Pratt's version of

events, Douglas did not even have a weapon and so she ostensibly could not have shot Ezell.)

Pratt told the grand jury that he was bleeding profusely and was in a great deal of pain, but did not ask to go to a hospital in Rochester. When asked why he gave a false name and bogus story at the hospital in Buffalo, Pratt again explained that he was scared, and that he just wanted to get the bullet out of his arm. A.145, attached as pp. 237 of App. E to Resp't Ans. (Docket #21).

On October 9, 1997, the grand jury returned an indictment charging Pratt with intentional murder, depraved indifference murder, criminal possession of a weapon in the second and third degrees, and bribery of a witness. The bribery count alleged that, on September 14, 1997, Pratt, while released on bail, offered to confer a benefit upon eyewitness Hudson with the understanding that it would influence his testimony.

Pratt was tried before a jury in Monroe County Court (Bristol, J.). The prosecution's key witness was Hudson who, shortly after the crime was committed, told the police that he saw Pratt shoot Ezell. Hudson testified that at about 9:25 p.m. on July 22, 1997, his ex-daughter-in-law told him that some people were fighting outside their apartment at 372 Hayward Avenue. T.303-304. Hudson went out onto the porch and saw two men and one woman standing on the sidewalk between 372 and 378 Hayward Avenue. T.305-309. The men were Pratt and Ezell; Hudson knew the woman as "Shorty." T.309-310. When he observed the group, Hudson was standing about fifteen to twenty feet away. T.312. According to Hudson, the two men had their hands on each other's shoulders and were mumbling at each other but he could not make out what they were saying very well. He heard someone say, "I got mine" and "I'm going to pop you," but he could tell who was saying what. T.312-313. Hudson then saw Pratt fire three shots at Ezell, who was hit in the chest and fell backwards. T.316-317. Hudson told the police that the gun used by Pratt looked like the type of gun used by the police. T.314.  Hudson did not see Ezell holding a gun.

-4-

T.318. After Pratt shot Ezell, Hudson saw him walk across the street and then return to look at Ezell's body for a moment. That is when Hudson went to call the police.

Hudson further testified that Pratt stopped by his house at about 9:30 p.m. on September 14, 1997, some two months after the shooting. T.318-319. Pratt asked Hudson what he had told the police; Hudson responded that he told the police what he had seen. Pratt suggested that Hudson change his statement and say that he was "high off a blunt [marijuana] and whiskey." When the prosecutor asked Hudson whether Pratt offered him anything in return, Hudosn answered, "Not at that time." T.320.

On cross-examination, defense counsel sought to impeach Hudson's credibility with prior bad acts and drug usage. Hudson acknowledged, "I use drugs. Used to. Used to." T.329. About five days before the shooting, he bought cocaine on the street from "Shorty" (*i.e.*, Douglas, Pratt's girlfriend). T.330, 354. Hudson acknowledged that he had been arrested and convicted for a number of crimes. However, Hudson had no pending charges at the time of trial and received nothing from the prosecution in return for his testimony.

Defense counsel also cross-examined Hudson about several statements given to the police just after the incident which differed from Hudson's trial testimony. When asked whether he spoke to a uniformed police officer named Slapelis, Hudson replied, "Not as I remember," and denied speaking to any uniformed police officer on the night of the shooting. T.333.

Patrol Officer Slapelis, however, testified that after the incident, he took a statement from Hudson in which Hudson said that "he heard three shots" and "saw the victim fall to the ground and two males running from the immediate area." T.594. Hudson told Officer Slapelis that one man was Pratt and the other was named Bleek. Bleek lived at 378 Hayward Avenue, the address

in front of which Ezell was shot.

Defense counsel also cross-examined Hudson about statements made to Officer Reinstein. Hudson insisted that he never spoke to Officer Reinstein. T.325. Officer Reinstein testified that Hudson gave him the following statement:

> [Hudson saw] three males in a scuffle . . . [The victim, Ezell] was being held by two other males . . . one was Thomas [Pratt] and the other was Bleek [who] lives at 378 Hayward. Bleek had a bottle in his hand. With the other he was holding [Ezell's] left hand. Bleek hit [Ezell] in the face with a bottle. [Pratt] shot [Ezell] three times. They ran across the street into backyard and got in a car.

T.336. Hudson denied giving this statement to Officer Reinstein. T.336.

Officer Reinstein testified that Hudson, after speaking to someone in his house, changed his story about the gender of the third party involved in the altercation. T.586. In a third conversation held fifteen minutes later between Hudson and Detective D'Ambrosio, Hudson stated that the person whom he identified as Bleek might have been a female instead of Bleek. T.583-592. Hudson acknowledged signing the statement taken by Detective D'Ambrosio. T.338.

Pratt's grand jury testimony, detailed *supra*, was admitted at trial. Pratt did not testify in his own behalf.

The attending nurse from Millard Fillmore hospital and the police officer who responded to the hospital to question Pratt also testified about him giving a false name and a bogus story at the emergency room. Contrary to Pratt's description of his injury, the nurse described Pratt's wound as "minor" and recounted that he was not bleeding very much at all. T.516-517. The nurse recalled that Pratt seemed clear and lucid and "didn't seem to be in any great discomfort." T.518.

With respect to the forensic evidence, the medical examiner testified that the victim suffered two gunshot wounds–one to the left forearm, caused by a .25-caliber bullet, and another

to the upper chest, caused by a 9-mm bullet. The 9-mm bullet passed through the victim's lungs and aorta, thereby causing his death. The forearm injury did not contribute to the victim's death. Pratt was shot only once, with a .25-caliber bullet.

The first police officer who responded to the crime scene discovered a .25-caliber Ravens Arms automatic pistol underneath the victim's body, which had been turned over and moved by the emergency medical personnel. Also found at the scene were two .25-caliber casings and one 9-mm casing. However, the murder weapon (the 9-mm gun) was never recovered.

The prosecution's ballistics expert, tested the recovered casings, the .25-caliber pistol, the bullets removed from petitioner and the victim, and clothing worn by the victim at the time he was shot. The hole in the chest area of the victim's jacket had "a great amount of tearing and ripping," indicating that hot gases from the gun barrel were close to the jacket when the fatal bullet was discharged. T.539-540. The ballistics expert testified that, based on his examination of the victim's clothing, the 9-mm bullet was fired at close range, *i.e.*, within several inches of the victim's body. The hole on the left sleeve of the jacket did not suggest that the .25-caliber bullet that caused the victim's forearm injury was fired from close range. T.540. The expert further testified that the .25-caliber bullet removed from the victim was fired from the pistol found at the crime scene, and that the bullet removed from petitioner's arm could have been fired by that same weapon. T.537, 549.

The chief medical examiner related that tests conducted on the victim's skin showed that the 9-mm bullet was fired at "near range," *i.e.*, "[w]ithin inches or so," whereas the .25-caliber bullet was not fired from close range. T.436, 438-439. On cross-examination, the medical examiner acknowledged that the initial report prepared by the deputy medical examiner stated

that there was "no positive evidence of close range of fire." T.454. The chief medical examiner

explained that his deputy's report, completed after the autopsy, was merely preliminary. Further

examination of the victim's skin under a microscope by the chief medical examiner showed

probable evidence of near contact range. T.456-457.

On March 9, 1998, the jury rendered a verdict acquitting Pratt of intentional murder and

criminal possession of a weapon with the intent to use it unlawfully, but convicting him of

depraved indifference murder (N.Y. Penal Law § 125.25(2)) and third degree criminal possession

of a weapon (N.Y. Penal Law § 265.02(4)). Pratt was sentenced to three and one-half to seven

years on the weapons possession count and twenty-five years to life on the murder count, those

sentences to be served concurrently.

## PROCEDURAL HISTORY

Represented by new counsel, Pratt appealed his conviction to the Appellate Division,

Fourth Department, of New York State Supreme Court and raised the following issues: (1) the

evidence was insufficient to prove that defendant fired the fatal shot; (2) the verdict that

defendant fired the fatal shot was against the weight of the evidence; (3) the verdict with respect

to the element of "depraved indifference" was against the weight of the evidence; (4) the trial

court erred in failing to issue a jury instruction on the justification defense; and (5) defendant did

not receive the effective assistance of counsel because counsel did not request a justification

instruction, counsel failed to compel the attendance of defendant's girlfriend at trial, and counsel

failed to move for a trial order of dismissal. The Fourth Department unanimously affirmed his

conviction on March 29, 2000. *People v. Pratt*, 270 A.D.2d 958, 705 N.Y.S.2d 310 (App. Div.

4th Dept. 2000). Pratt sought leave to appeal with respect to all of the issues raised in his

appellate brief, but the New York Court of Appeals denied his application on June 15, 2000.

*People v. Pratt*, 95 N.Y.2d 838, 735 N.E.2d 425, 713 N.Y.S.2d 145 (N.Y. 2000).

Apparently, Pratt filed a "series of submissions" in Monroe County Court between December 2000 and February 2001 requesting an order vacating his conviction pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10 "based primarily upon the alleged errors of his trial counsel." September 24, 2001 Order of Monroe County Court (Kohout, J.) at 2, attached as App. O to Resp't Ans. (Docket #21). On March 2, 2001, Monroe County Court denied those motions without an evidentiary hearing. *Id.* Pratt then submitted another *pro se* C.P.L. § 440.10 motion on June 29, 2001, *see* App. K to Resp't Ans. (Docket #21), alleging that his trial counsel had a conflict of interest because counsel was indicted on, and convicted of, felony charges in December 2000, some two years after the conclusion of Pratt's trial. Pratt claimed that counsel did not represent him zealously out of fear that counsel's own misdeeds would be uncovered. *See id.* Monroe County Court denied Pratt's application on the basis that he presented no facts in support of his claims, only his conclusory contention that counsel's performance was compromised. *See id.*

Pratt filed a petition for federal habeas relief on May 8, 2002 (Docket #1), in which he asserted the following arguments: (1) the evidence was insufficient to support the conviction; (2) the verdict with respect to the element of "depraved indifference" was against the weight of the evidence; (3) the trial court erred in not instructing the jury on the defense of justification; (4) trial counsel was ineffective in failing to compel the attendance of petitioner's girlfriend, Latisha Douglas; failing to move for a trial order of dismissal; failing to have petitioner testify regarding the "events of my jury min [*sic*] to the fact-finder;" failing to request the lesser included offense

of manslaughter; and failing to request a jury instruction on justification. *See* Petition at 7-8 (Docket #1).

On July 12, 2002, Pratt filed a supplement to his petition (Docket #5) in which he claimed that on the day he was sentenced, he learned that his attorney had a conflict of interest because the attorney had previously represented the victim's father some years ago. In his reply declaration filed March 22, 2005, petitioner provided further argument regarding his trial counsel's alleged conflict of interest that stemming from counsel's having represented the father of the victim many years ago. *See* Docket #35. Pratt claimed that by failing to inquire into trial counsel's potential conflict of interest when it was revealed at the sentencing hearing, the trial court denied him of his Sixth Amendment right to the effective assistance of counsel. Pratt also argued in the reply declaration that trial counsel was ineffective for failing to pursue an alternative defense of justification.

Pratt then sought to stay his pending habeas petition so that he could return to state court in order to exhaust his claims raised in the supplement to the petition and reply declaration. *See* Docket ##31, 37. On September 29, 2005, the Court (Payson, M.J.) denied the request for a stay without prejudice because petitioner had failed to submit a proposed amended petition. Pratt was ordered to submit a proposed amended petition no later than November 11, 2005, so that the Court could evaluate petitioner's request for a stay in accordance with the criteria recently set forth in *Rhines v. Weber*, 544 U.S. 269, 125 S. Ct. 1528, 1535, 161 L.Ed.2d 440 (2005). *See* Docket #39.

Since that time, it has come to this Court's attention that on September 19, 20005, petitioner submitted copies of an application of a writ of error *coram nobis* in which he argued

that his appellate counsel was ineffective in failing to argue on appeal that the trial court erred in

failing to conduct an inquiry into the alleged conflict of interest. Pratt also argued that when he

ran out of funds to pay his legal fees but still wished to file a collateral motion to vacate the

judgment, his retained counsel should have moved to have been assigned as counsel so that he

could represent Pratt free of cost. *See* Petitioner's Letter dated September 19, 2005, with

attachments. However, this packet of correspondence had not been docketed at the time

Magistrate Judge Payson filed her Order. Presumably, had this correspondence been before the

Court, it would have been treated as a proposed amended petition.

I will construe Pratt's September 19th submission as an amended pleading in which he

raises two claims of ineffective assistance of appellate counsel as detailed in the preceding

paragraph. There is no need to consider whether a stay is required because Pratt has already

exhausted his state court remedies on these claims, as is evidenced by the copies of his *coram*

*nobis* application submitted on September 19th.  Before I may consider these two new claims, I

must first determine whether they are time-barred by the one-year statute of limitations

applicable to Pratt's habeas petition, *see* 28 U.S.C. § 2244(d). In order for them to be timely, they

must "relate back" to the original petition[2] for purposes of Federal Rule of Civil Procedure 15(c).

*See Ching v. United States*, 298 F.3d 174, 181 (2d Cir. 2002) (stating that Fed. R. Civ. P. 15(c)

governs the timeliness of a motion to amend submitted after § 2244(d)(1)'s statute of limitations

has expired).

Rule 15(c) provides that an amendment of a pleading relates back to the date of the

---

[2] By "original petition," this Court is referring both to the form petition for habeas corpus filed on (Docket #1) and the document which Magistrate Judge Payson referred to as the supplement to the petition (Docket #5) filed on .

original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c). The "relation back" principle of Rule 15(c) applies to petitions for habeas corpus. *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 815-16 (2d Cir. 2000). "So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order." *Mayle v. Felix*, __ U.S. __, 125 S.Ct. 2562, 2574, 162 L. Ed.2d 582 (2005).

Pratt's newly added claims belong to the same common core of operative facts as his original habeas petition. Although the ineffective assistance of appellate counsel claim is based on a new theory of relief, it arises from the same facts as the original habeas petition. Pratt alleged in the supplement to the petition that trial counsel was ineffective because he represented petitioner despite having a conflict of interest and that the trial court failed to make a sufficient inquiry into the nature and extent of the alleged conflict of interest. Pratt's ineffective assistance of counsel claim is based on appellate counsel's failure to raise these issues on direct appeal. Thus, the original and amended petitions would be based on the same common core of operative facts, and Rule 15(c)'s relation back principles would apply. Therefore, Pratt's ineffective assistance of appellate counsel claims are not untimely pursuant to 28 U.S.C. § 2244(d)(1)'s statute of limitations.

For the reasons set forth below, the petition is denied.

## DISCUSSION

### Exhaustion

A petitioner must exhaust all available state remedies either on direct appeal or through a

collateral attack of his conviction before he may seek a writ of habeas corpus in federal court. 28 U.S.C. § 2254(b); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054 (1995). The exhaustion of state remedies requirement means that the petitioner must have presented his constitutional claim to the highest state court from which a decision can be obtained. *See Morgan v. Bennett*, 204 F.3d 360, 369 (2d Cir. 2000) (citing *Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991)). A claim is properly exhausted when the state court is fairly apprised of the claim's federal nature and of the factual and legal premises underlying the claim. *Grey*, 933 F.2d at 119-20.

Respondent asserts, "We make no claim that petitioner has failed to exhaust State remedies." Resp't Ans. at 5 (Docket #21). Respondent then hedges its bets, stating, "However, if [the] District Court should find otherwise, we do not waive the exhaustion requirement." *Id.* That is the extent of respondent's discussion of exhaustion. Respondent goes on to argue the merits of petitioner's claims. While this Court will rule on any legitimate claim before it, any suggestion that this Court search for flaws in petitioner's claims to aid respondent in its responsibilities is wholly inappropriate. The Court does not represent respondent and is not in the business of making respondent's legal arguments for it. Thus, given respondent's position, which the court interprets as a explicit waiver on the issue of exhaustion, and because any issues of exhaustion and procedural default raised by Pratt's petition would be more time-consuming to resolve than the substantive claims presented therein, in the interest of judicial economy, the Court will proceed to the merits of all of petitioner's claims.

**<u>Standard of Review</u>**

To prevail under 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective

Death Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction

must demonstrate that the state court's adjudication of his federal constitutional claim resulted in

a decision that was contrary to or involved an unreasonable application of clearly established

Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual

determination in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d)(1), (2);

*Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

**Merits of the Petition**

> **1.      Insufficiency of the evidence**

On habeas review, a court is not permitted to "'make its own subjective determination of

guilt or innocence.'" *Quartararo v. Hanslmaier,* 186 F.3d 91, 97 (2d Cir. 1999) (quoting *Herrera

v. Collins,* 506 U.S. 390, 402 (1993)). A conviction will be found to be supported by sufficient

evidence if, "'after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable

doubt.'" *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S.

307, 319 (1979)) (emphasis in original). Accordingly, a habeas petitioner bears a "heavy burden"

in challenging the sufficiency of the evidence supporting his conviction. *Id.* The jury is

exclusively responsible for determining the credibility of a witness, and a habeas court may not

revisit the fact-finder's credibility determinations. *Marshall v. Lonberger*, 459 U.S. 422, 432-35

(1983); *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993).  A reviewing court may not

"'reassess the fact specific credibility judgments by juries or . . . weigh conflicting testimony.'"

*Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y. 1996) (quoting *Anderson v. Senkowski*,

1992 WL 225576, at *3 (E.D.N.Y. Sept. 3, 1992)).

Here, Hudson testified that he saw Pratt shoot Ezell, the victim, in the chest. That eyewitness testimony alone was legally sufficient to support the conviction. As the Second Circuit has noted, "'the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction[.]'" *United States v. Frampton*, 382 F.3d 213, 222 (2d Cir. 2004) (quoting *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979) and citing *Weiler v. United States*, 323 U.S. 606, 608 (1945); 7 Wigmore, Evidence § 2034 (Chadbourn rev. 1978) ("In general, the testimony of a single witness, no matter what the issue or who the person, may legally suffice as evidence upon which the jury may found a verdict.")). Viewing the additional evidence in the light most favorable to the prosecution, a rational jury could have found (1) that petitioner, by his own admission, was fighting with Ezell, the victim, at the time Ezell was shot and killed; (2) that the fatal bullet was fired at close range; (3) that petitioner was the only person in close range to Ezell; (4) that petitioner, by his own testimony, was the only person besides Douglas in the general area; and (5) that Douglas, according to petitioner, was not armed. A rational jury, based on the evidence heard at trial, easily could have rejected Pratt's version of events as set forth in his grand jury testimony which was introduced at trial. For instance, Pratt testified that only two shots were fired, both by the victim. It is undisputed, however, that the victim was shot twice and Pratt shot once, and that three bullet casings were found at the scene.

Furthermore, a rational jury could have inferred guilt from petitioner's grand jury testimony in which he explained that, despite his belief that neither he nor Douglas had done anything wrong, he did not call the police or an ambulance after having been shot but rather drove over 60 miles to a hospital outside of Buffalo where he lied about his identity and the circumstances of his own injury. *See, e.g., People v. Chico*, 90 N.Y.2d 585, 591, 687 N.E.2d

-15-

1288, 665 N.Y.S.2d 5 (N.Y. 1997) (stating that jury may consider defendant's flight as evidence

of his consciousness of guilt). In addition, the jury could have credited Hudson's eyewitness

testimony that, while Pratt was out on bail prior to indictment, he visited Hudson's house and

suggested that Hudson change his story about what he (Hudson) saw on the night of the murder.

This conduct is further evidence of consciousness of guilt.

      Pratt attacks Hudson's credibility, contending that his testimony was so unworthy of

belief as to be incredible as a matter of law. Admittedly, Hudson had a history of drug use and

criminal activity. However, there never has been any contention that Hudson was under the

influence of drugs or alcohol at the time he witnessed the shooting. Nor did Hudson have any

criminal charges pending at the time.  Thus, he received nothing from the prosecution in

exchange for his testimony. It is true that Hudson gave inconsistent statements to the police

regarding several collateral matters, in particular, the gender of the third person involved in the

altercation.  However, those inconsistencies do not render Hudson's testimony incredible as a

matter of law; Hudson did not waver with respect to his testimony that he saw Pratt shoot Ezell.

      It is well settled that the jury is exclusively responsible for determining a witness's

credibility. *United States v. Strauss*, 999 F.2d at 696 (citations omitted)). Where there is

conflicting testimony at trial, the reviewing court "'defer[s] to the jury's resolution of the

witnesses' credibility.'" *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000) (quoting

*United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998)). Thus, a reviewing court is not permitted

to reassess the fact-specific credibility judgments by juries or weigh conflicting testimony. *See*

*United States v. Giraldo*, 80 F.3d 667, 673 (2d Cir.) ("The weight of the evidence is a matter for

argument to the jury, not a ground for reversal on appeal."), *cert. denied*, 519 U.S. 847 (1996).

In this case, the jury's decision primarily was a matter of choosing whether to believe the prosecution witnesses' version of events or to believe the version offered by the defense. *Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981). The jury chose to credit the prosecution's witnesses, "despite the inconsistencies in the evidence and the character testimony," and this Court cannot say that on all the evidence presented no rational jury could have found Pratt guilty beyond a reasonable doubt of all of the elements of depraved indifference murder. *Id.*; *see also Carromero v. Strack*, 1998 WL 849321, at *5 (S.D.N.Y. Nov. 19, 1998) (evidence sufficient where jury credited prosecution witnesses' testimony "despite some inconsistencies between their trial testimony and prior statements to the police and to the grand jury"); *Taxiarhopolous v. Spence*, 1992 WL 403112, at *4 (E.D.N.Y. Dec. 28, 1992) (The petitioner "cannot show that the evidence was insufficient to support conviction. For example, he challenges the credibility of the main prosecution witness . . . , pointing to alleged inconsistencies in his testimony. This, however, was an argument made to, and properly resolved by, the trial jury.").

**2.      Trial court error in failing to issue jury charge on defense of justification**

Pratt contends that the trial court erred in failing to give a jury instruction on the law of justification, despite the fact that defense counsel failed to request such an instruction and "despite the fact that [petitioner's] ostensible defense was that he was not the shooter." Petitioner's Appellate Brief at 33, attached as App. D to Resp't Ans. (Docket #21). Under New York's Penal Law, a person may use physical force upon another person "when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be use or imminent use of unlawful physical force by such other person."

N.Y. Penal Law § 35.15(1). As set forth below in the discussion of petitioner's claim that trial counsel was deficient in failing to request a justification charge, petitioner was not entitled to such a charge based on the evidence adduced at trial. Thus, it was not error for the trial court to decline to give a justification charge *sua sponte.*

### 3.      Weight of the evidence

Pratt argues that the jury's verdict with respect to the element of "depraved indifference" in the murder count was against the weight of the evidence. A claim that a verdict was against the weight of the evidence derives from C.P.L. § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence." N.Y. Crim. Proc. Law § 470.15(5). Thus, the "weight of the evidence" argument is a pure state law claim grounded in the criminal procedure statute, whereas a legal sufficiency claim is based on federal due process principles. *People v. Bleakley*, 69 N.Y.2d 490, 495, 515 N.Y.S.2d 761, 508 N.E.2d 672 (1987). Since a weight-of-the-evidence claim is purely a matter of state law, it is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Because Pratt's "weight of the evidence" claim does not present a cognizable federal issue for this Court to review, the claim must be dismissed. *E.g.*, *Alvarez v. Conway*, No. 05 Civ. 3235(NRB), 2005 WL 3434634, at *4 (S.D.N.Y. Dec 13, 2005) ("Petitioner's claim that the

verdict was against the weight of the evidence does not raise a federal question appropriate for

habeas review."); *Kearse v. Artuz*, No. 99 Civ. 2428(TPG), 2000 WL 1253205, at *1 (S.D.N.Y.

Sept. 5, 2000) (summarily dismissing challenge to verdict against the weight of the evidence on

the ground that "[d]isagreement with a jury verdict about the weight of the evidence is not

grounds for federal habeas corpus relief"). I note that in keeping with the principle that

complaints of *pro se* petitioners are to be considered liberally in their favor, *Haines v. Kerner*,

404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), some habeas courts have construed

weight-of-the-evidence claims as insufficiency-of-the-evidence claims. *E.g.*, *Davis v.*

*McLaughlin*, 122 F. Supp.2d 437, 441 (S.D.N.Y. 2000) (treating petitioner's claim that his

conviction was against the weight of the evidence and that the prosecution did not prove his guilt

beyond a reasonable doubt as legal sufficiency claim).  Even if the Court were to construe Pratt's

petition liberally as raising a claim that the evidence was legally insufficient to support the

verdict, habeas relief still would not be warranted.

**4.      Ineffective assistance of trial counsel**

      **a.      Legal standard**

In order to prevail on a claim of ineffective assistance of counsel within the framework

established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80

L. Ed.2d 674 (1984), a habeas petitioner must satisfy a two-part test. First, a petitioner must

demonstrate that counsel's performance was so deficient that counsel was not functioning as

"counsel" within the meaning of the Sixth Amendment to the Constitution. *Id.* at 688. In other

words, a petitioner must show that his attorney's performance "fell below an objective standard

of reasonableness." *Id.* Second, a petitioner must show that counsel's deficient performance

prejudiced him. *Id.* at 694. To establish the "prejudice" prong of the *Strickland* test, a petitioner

must show that a "reasonable probability" exists that, but for counsel's error, the outcome of the

trial would have been different. *Id.* at 694. However, "there is no reason for a court deciding an

ineffective assistance claim to . . . address both components of the inquiry if the defendant makes

an insufficient showing on one." *Id.* at 697.

      **b.**    **Alleged grounds of attorney ineffectiveness**

Pratt faults trial counsel for failing to compel his girlfriend to testify at trial; failing to

move for a trial order of dismissal at the close of the prosecution's proof; failing to have

petitioner testify regarding the "events of my jury min [*sic*] to the fact-finder"; and failing to

request that the lesser included of manslaughter be submitted to the jury. Pratt also contends that

he was denied his constitutional right to counsel because his attorney was operating under a

conflict of interest. As discussed below, none of these alleged errors, taken singly or together,

resulted in constitutional prejudice to Pratt.

      **i.**    **Failure to compel attendance of witness**

Pratt faults trial counsel for failing to do "what was necessary" to compel Douglas, Pratt's

girlfriend, to testify at trial. Following the close of the prosecution's case-in-chief, defense

counsel sought to call attorney Thomas Cocuzzi ("Cocuzzi") to testify regarding inculpatory

statements that Douglas made to him. Cocuzzi informed the trial court that Douglas, his client,

had come to see him and had stated that "she had shot an individual that Mr. Pratt had been

charged with shooting." Douglas further indicated to Cocuzzi "what led up to the shooting" and

advised him that he could inform the district attorney that she was taking this position. T.566.

Defense counsel attempted to introduce Cocuzzi's testimony on the ground that Douglas's

statements qualified as a declaration against penal interest and were admissible as an exception to the hearsay rule. T.553-558.

The trial rejected counsel's argument, holding that there was no showing that the witness was unavailable to testify at trial and that there was "no clear showing of awareness of adverseness to her penal interest" because Douglas was told "with her attorney's assurance, by [the prosecutor] that it wouldn't be used against her." T.577. Defense counsel responded as follows:

> In reference to the first point, there's been no objection of unavailability of the witness. If there is some objection I can testify as an officer of the court that I've spoken with Latisha Douglas. She said she'd sign a statement. I said, no, you have to come to court to testify. She's refused to come. She says she's going to take the Fifth Amendment. Pursuant to *People v. Brown*, that's unavailability, Your Honor. She said she won't testify in court.

T.579. The trial court responded, "We'll let her come in and claim it then. I think that's what the case says, Sir – well, make your record." T.579. Douglas did not come in to testify.

On direct appeal, the appellate division held as follows: "Assuming, *arguendo*, that defense counsel erred in failing to establish the unavailability of the declarant of an alleged statement against penal interest, we conclude that defendant failed to show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *People v. Pratt*, 270 A.D.2d at 958 (citation and quotation omitted).

Pratt suggests that if Douglas had been compelled to come to court, she might have had a change of heart and agreed to testify. This is pure speculation. Although it may have been better practice for trial counsel to subpoena Douglas to testify in order to make a complete record, as suggested by the trial court, I nevertheless cannot find that there is a reasonable probability that

-21-

the outcome of Pratt's trial would have been different had Douglas been produced for trial.

First of all, assuming that Douglas was summoned to court and refused to testify, thereby satisfying the "unavailability" prong of the declaration against penal interest exception, there is no reason to believe that the trial judge would have changed its ruling and allowed Douglas's attorney to testify regarding the inculpatory statements allegedly made by her. The trial judge also denied on the application on the ground that there was "no clear showing" that Douglas was aware that her statements were adverse to her penal interest. There is no question that a statement admitting to the shooting of another who died from gunshot wounds in an unjustified homicide case is *per se* adverse.  Nevertheless, the representations that her lawyer made to her to the effect that the district attorney would not use her statements against her effectively precluded any finding of adverseness without any further showing. Even assuming that defense counsel would have been able to establish Douglas's unavailability by reason of her invocation of the Fifth Amendment, Pratt offers no effective basis in these circumstances for a finding of "adverseness of interest."

Assuming, for the sake of argument, that the trial court would have changed its ruling and allowed Douglas's attorney to testify about Douglas's out-of-court, inculpatory statements, they would not have created a reasonable doubt where none otherwise existed. It is significant that Douglas *did not deny* in her purported statement as set forth in the defense offer of proof that Pratt shot and killed Ezell; she simply said that she fired a shot at Ezell, who was struck with bullets from two different guns. This did not create a circumstance that would have exculpated Pratt because the evidence was overwhelming that he had also fired a shot at the victim. Based on the evidence before the trial court–namely, the use of two guns of different calibers and

-22-

Hudson's eyewitness testimony–it most likely would not have excused his culpability.

### ii.    Failure to move for a trial order of dismissal

Pratt complains that defense counsel was ineffective because he failed to move for a trial order of dismissal pursuant to C.P.L. § 290.10 with respect to the murder counts in order to preserve an insufficiency-of-the-evidence claim for appellate review. Even assuming that counsel erred in not making such a motion, Pratt was not prejudiced thereby: on direct appeal, the state court reviewed Pratt's insufficiency-of-the-evidence claim *sua sponte*, despite counsel's failure to preserve the issue by making a motion to dismiss.

### iii.    Failure to request a jury instruction on justification

Pratt alleges that by failing to pursue a defense of justification, trial counsel deprived the jury of the option to acquit petitioner of the charge of both depraved indifference and intentional murder.  Given the proof as presented at trial, I cannot find that defense counsel acted unreasonably in declining to pursue the defense of justification and instead attempting to avoid Pratt's conviction for murder on other grounds.

Under New York law, a person may, subject to certain exceptions, "use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person." N.Y. Penal Law § 35.15(1). Notably, however, Pratt denied using any physical force during the altercation–in his grand jury testimony, which was introduced at trial, Pratt stated that he did not shoot the victim or even have a gun on his person. Thus, Pratt was not entitled to a justification charge, since his own version of the facts taken together with the eyewitness evidence could not support such a charge.

*See People v. Gonzalez*, 169 A.D.2d 662, 565 N.Y.S.2d 43 (App. Div. 1ˢᵗ Dept. 1991) ("As

defendant denied shooting the complainant, the trial court's failure to charge justification was not

error, since no view of the evidence could support such a charge[.]") (citing *People v. Padgett*,

60 N.Y.2d 142, 468 N.Y.S.2d 854, 456 N.E.2d 795 (N.Y. 1983)).

Moreover, in order for a defense of justification be plausible, the jury would have had to

reject Pratt's grand jury testimony. Trial counsel essentially would be presenting a defense of,

"defendant didn't shoot anyone, but if you don't believe that, then he was justified in doing it."

The record before the Court provides no basis for the Court to determine that the decision not to

raise justification as a defense was not strategic, or that at the time Pratt disagreed with the

strategy undertaken by trial counsel. Indeed, it would not be an unreasonable strategy to present

only one defense theory rather than attempting to argue two inconsistent defenses, one of which

was contradicted by petitioner's own testimony.  It is well settled that a defendant may not claim

ineffective assistance of counsel merely because counsel's chosen strategy did not succeed. *See*

*United States v. Di Tommaso*, 817 F.2d 201, 215 (2d Cir. 1987) (instructing a reviewing court

not to "second-guess trial counsel's defense strategy simply because the chosen strategy has

failed").

### iv.    Failure to request lesser included offense of manslaughter

Pratt contends that trial counsel erred in failing to request that the court charge the lesser

included offense of manslaughter. In this case, first degree manslaughter could have been the

appropriate lesser included offense of intentional murder, and second degree manslaughter the

lesser included offense of depraved indifference murder. *See* N.Y. Penal Law §§ 125.15, 125.20.

However, in order to be entitled to a charge on a lesser included offense, a defendant must not

only show that it is theoretically impossible to commit the greater crime without committing the lesser, he must also establish that there is a reasonable view of the evidence that would permit the jury to conclude that the defendant committed the lesser but not the greater offense. *People v. Green*, 56 N.Y.2d 427, 432, 452 N.Y.S.2d 389, 437 N.E.2d 1146 (N.Y. 1982). In this case, there is no reasonable view of the evidence to justify a charge of first degree manslaughter based on an intent to cause "serious physical injury." The proof showed that Pratt shot Ezell in the chest within a range close enough to cause stippling. This establishes that petitioner intended to do more than merely seriously injure Ezell.

Nor does a reasonable view of the evidence justify a charge of second degree ("reckless") manslaughter. Under New York law, a defendant acts recklessly when he consciously disregards a substantial and unjustifiable risk. *People v. Cruciani*, 36 N.Y.2d 304, 367 N.Y.S.2d 758, 327 N.E.2d 803 (N.Y. 1975) (citing N.Y. Penal Law § 15.05).  On the other hand, a defendant is guilty of depraved indifference murder when, "under circumstances evidencing a depraved indifference to human life, [he] recklessly engages in conduct which creates a grave risk of death to another person." N.Y. Penal Law § 125.25(2). The state of mind element for depraved indifference murder is satisfied by "objective circumstances of exceptionally high, unjustified risk of death." The New York Court of Appeals has explained that such circumstances "constitute the primary means by which the Legislature differentiated between the reckless state of mind sufficient to establish the mental culpability of manslaughter and the extreme recklessness of [depraved indifference] murder under Penal Law § 125.25(2)." *People v. Sanchez*, 98 N.Y.2d 373, 777 N.E.2d 204, 748 N.Y.S.2d 312 (N.Y. 2002).  Here, Pratt's firing of a shot at close range into Ezell's chest evidenced a conscious disregard of more than a substantial

-25-

and unjustifiable risk–these were "objective circumstances" under which a "grave risk" of death

was "exceptionally high." *Sanchez*, 98 N.Y.2d 373, *supra* ("[A]ccepting the jury's determination

that the killing of [the victim] was not intentional . . . , defendant's shooting into the victim's

torso at point-blank range presented such a transcendent risk of causing his death that it readily

meets the level of manifested depravity needed to establish murder under Penal Law §

125.25(2).").

     Even if the lesser included offense of manslaughter were proper–which this Court

rejects–defense counsel may have had a tactical reason for not requesting lesser included offenses

of first and second degree manslaughter. "Submission of lesser included offenses may give the

jury a basis for finding a defendant guilty of a crime where the prosecution was unable to prove

the elements of the original crime charged beyond a reasonable doubt." *Colon v. Smith*,  723 F.

Supp. 1003, 1008 (S.D.N.Y. 1989). Here, counsel's strategy was to present a defense of

misidentification–that it was the third person involved in the altercation, not Pratt, who fatally

shot the victim. This type of defense, which denies guilt, is "a strategy that 'practically precludes

a request for an instruction on a lesser included offense.'" *Yu v. United States*, No. 97 Civ. 2736,

1997 WL 423070 at *3 (S.D.N.Y. July 29, 1997) (quoting *Rios v. United States*, No.

CV-91-4384, 1992 WL 328931, at * 6 (E.D.N.Y. Oct. 13, 1992)). The strategy of pursuing a

completely exculpatory defense instead of a partially exculpatory defense is one of the many

decisions made by trial counsel which are entitled to substantial deference. *See Tommaso*, 817

F.2d at 215 (holding that failure of trial counsel to argue for admission of exculpatory portions of

defendant's postarrest statement which codefendant had successfully moved to redact was not

ineffective assistance, where statement, viewed in its entirety, contained not only denial that

defendant counted drug profits, but also admission that defendant, along with codefendant, met third person on two occasions, and statement was properly redacted because of its tendency to inculpate codefendant).  Thus, even if it would have been proper for the court to charge the lesser offenses, the failure of petitioner's counsel to request that it do so in this case amounted to a tactical choice not rising to the level of ineffective assistance of counsel. *See, e.g.*, *Colon*, 723 F. Supp. at 1008 ("A failure to request charges on all possible lesser included offenses may be proper trial strategy . . . and this decision therefore did not constitute ineffective assistance of counsel."); *Rios*, 1992 WL 328931, at * 6 ("The tactical decision to pursue a complete, exculpatory defense rather than a partial one enjoys substantial deference . . . Having presented no evidence on a partial defense, counsel had no reason or basis to request an instruction on the lesser included offense.").

### v.      Counsel had a conflict of interest

Pratt contends because his trial counsel had, in the past, represented the victim's father, Pratt was entitled to automatic reversal because counsel had a conflict of interest. "'A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel.'" *Eisemann v. Herbert*, 401 F.3d 102, 107 (2d Cir. 2005) (quoting *United States v. Blau*, 159 F.3d 68, 74 (2d Cir. 1998)). In *Holloway v. Arkansas*, 435 U.S. 475 (1978), defense counsel had objected that he could not adequately represent the divergent interests of three co-defendants, but the trial court denied counsel's motions without inquiry. The Supreme Court in *Holloway* deferred to counsel's judgments regarding the existence of a detrimental conflict and created an automatic reversal rule "only where defense counsel is forced to represent codefendants over his timely objection, unless the trial court has determined

that there is no conflict." *Mickens v. Taylor*, 535 U.S. 162, 168 (2002) (citing *Holloway*, 435 U.S. at 488) ("[W]henever a trial court improperly requires joint representation over timely objection reversal is automatic.")). In *Cuyler v. Sullivan*, the Supreme Court declined to extend *Holloway*'s automatic reversal rule to a case of multiple representation where there was no objection from defendant or counsel or anyone else. 446 U.S. 335, 347-47 (1980).  Absent an objection, a defendant in that situation must demonstrate that "a conflict of interest actually affected the adequacy of his representation." *Id.* at 348-49; *accord Mickens*, 535 U.S. at 168. *Sullivan* construed *Holloway* to require inquiry by the trial court only when it "knows or reasonably should know that a particular conflict exists." *Id.*; *accord Mickens*, 535 U.S. at 168. In *Mickens*, however, the Supreme Court declined to accept petitioner's "proposed rule of automatic reversal when there existed a conflict that did not affect counsel's performance, but the trial judge failed to make the *Sullivan*-mandated inquiry," stating that it made "little policy sense." *Mickens*, 535 U.S. at 172. Where the trial court has failed to inquire into a potential conflict of interest about which it knew or reasonably should have known, the defendant still must establish that this conflict of interest adversely affected counsel's performance. *Id.* at 173-74.

At Pratt's sentencing hearing, trial counsel announced,

> . . . Your Honor, there is one point that the Pratt family and Mr. Pratt would like me to bring to the Court's attention and that's that a long time ago I represented the victim's father in this matter and that the Pratt family felt that this may have been a conflict of interest. I was made aware of this, I believe, on the last day of the trial; Mr. Curran [the prosecutor] had told me. I wasn't aware that this gentleman was the father of the victim, your Honor. He was in the courtroom everyday [*sic*] and I obviously knew who he was, but I wasn't aware that he was the father of the victim and as soon as this was told to me, I told the Pratt family about it, your Honor.

S.8-9.[3] Trial counsel then moved on to discuss the issue of Pratt's sentence. There was no further discussion of the conflict issue. The trial court made no further inquiry, and neither Pratt nor anyone in his family voiced any concerns. *See id.*

Clearly this is a case where the trial court knew of a potential conflict of interest but did not conduct a *Sullivan* inquiry. As *Mickens* makes clear, however, Pratt may not rely on the trial court's failure to inquire in order to void his conviction. Rather, he must demonstrate that the potential conflict adversely affected counsel's performance. This Pratt is unable to do on the factual record present here.

As an initial matter, I note that counsel did not become aware of the conflict until the last day of trial when the bulk of his representation had been completed. It is apparent from the trial transcript that counsel zealously represented his client and in fact obtained a trial order of dismissal of the witness bribery charge and secured an acquittal on the charges of intentional murder and second degree criminal possession of a weapon. Pratt points to no specific deficiencies in counsel's representation but instead relies solely on the trial court's failure to inquire into counsel's previous representation of the victim's father. This reliance is misplaced because automatic reversal is not available where, as here, petitioner has failed to demonstrate any adverse effect resulting from counsel's alleged conflict of interest.

Moreover, I note that the fact that a defendant's counsel may have previously represented the victim or one of his family members does create a *per se* conflict of interest, contrary to petitioner's contention. In *Strouse v. Leonardo*, the defendant had been convicted of murdering his mother. He contended that trial counsel's prior representation of his mother gave rise to a

---

[3] Citations to "S.__" refer to the transcript of the sentencing hearing.

conflict of interest. Apparently, counsel had drafted the defendant's mother's will as well, done some occasional real estate work for her and handled small matters relating to her divorce. The Second Circuit could "discern no way in which this prior work for [defendant's mother] created a conflict in [counsel's] representation of [defendant] at his murder trial." *Id.* (citing *Kirkpatrick v. Butler*, 870 F.2d 276, 284 (5th Cir. 1989) (no conflict where defense counsel had friendship with and had in the past represented members of murder victim's family), *cert. denied*, 493 U.S. 1051 (1990); *Crisp v. Duckworth*, 743 F.2d 580, 588 (7th Cir. 1984) (no conflict where defense counsel represented murder victim in unrelated criminal action and informed defendant of the prior representation), *cert. denied*, 469 U.S. 1226 (1985).

### v.     Failure to have petitioner testify at trial

Pratt asserts in a conclusory manner that counsel erred in failing to have him testify regarding "the events of [his] jury min [*sic*] to the fact-finder" at trial. He provides no further argument in support of this claim.

It is a defendant's decision whether or not he should testify in his behalf at trial, and "trial counsel's duty of effective assistance includes the responsibility to advise the defendant concerning the exercise of this constitutional right." *Brown v. Artuz*, 124 F.3d 73, 74 (2d Cir. 1997). Pratt may be alleging that counsel failed to inform him about his right to testify or that despite knowing of petitioner's desire to testify, counsel refused to call him to the stand. However, because Pratt provides no supporting facts in support of his claim, it is impossible to tell whether counsel failed to advise him concerning his right to testify or ignored his desire to testify in his behalf.

Even assuming that petitioner was not advised of his right to testify, or that counsel

prevented him from doing so, petitioner has offered no evidence demonstrating that his failure to testify prejudiced his defense. *See Brown*, 124 F.3d at 79-81 (defendant claiming ineffective assistance due to counsel's failure to advise about personal right to testify must still establish prejudice under second prong of *Strickland*). I note that counsel did offer the minutes of petitioner's grand jury appearance at trial, in which petitioner had offered exculpatory testimony regarding his actions on the night of the shooting.  It is quite probable that, had petitioner testified, his defense would have been prejudiced: he had a prior felony conviction for criminal possession of a weapon and was serving probation on this charge when he allegedly killed Ezell. This fact certainly would have been elicited during cross-examination. Thus, defense counsel's alleged failure to put petitioner on the stand was arguably reasonable and cannot be shown to have prejudiced petitioner's defense. *See United States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992) (counsel not ineffective for failing to call defendant because "[i]t was a reasonable tactical decision to rely exclusively on attacking the Government's witnesses and presenting independent testimony rather than to subject [defendant] to all of the risk attendant on cross-examination" ).

**5.      Ineffective assistance of appellate counsel**

      **a.      Legal standard**

The *Strickland* two-pronged standard applies equally to claims of ineffective assistance of appellate counsel. *E.g.*, *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied*, 508 U.S. 912 (1993); *Smith v. Robbins*, 528 U.S. 259, 285 (2000). In attempting to show that appellate counsel's failure to raise a state law claim amounted to deficient performance, it is not enough for a petitioner to demonstrate merely that counsel omitted a non-frivolous argument; after all, counsel is under no duty to advance every colorable argument that could be made in

light of the facts of petitioner's case.   *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)

(citing *Jones v. Barnes*, 463 U.S. 745, 754 (1983)). "To establish prejudice in the appellate

context, a petitioner must demonstrate that 'there was a "reasonable probability" that [his] claim

would have been successful before the [state's highest court].'"*Id.* at 534 (quoting *Claudio*, 982

F.2d at 803) (alteration in original) (footnote omitted); *Aparicio v. Artuz,* 269 F.3d 78, 95 (2d

Cir. 2001). Although the performance determination may not be made with the benefit of

hindsight, the prejudice, or outcome determination, may be. *Id.* (citing *Lockhart v. Fretwell*, 506

U.S. 364 (1993))

   b.   **Alleged grounds of attorney ineffectiveness**

      i.   **Failure to argue that the trial court did not fulfill its duty to inquire**

   Pratt claims that appellate counsel disregarded "the multiple conflicts of trial counsel in

his representation of [petitioner] at trial and the court's duty to inquire." Petitioner's Affidavit in

Support of Writ of Error *Coram Nobis* at 6, attached to Petitioner's September 19, 2005 Letter.

Pratt contends that the court's failure to inquire into the potential conflict of interest created by

trial counsel's previous representation of the victim's father was an issue that "could have led to

*per se* reversal of the conviction if presented on direct appeal." *Id.*

   Pratt is incorrect in his contention. The New York Court of Appeals has held that a trial

judge who is aware of a situation where a conflict may exist has an obligation to "conduct a

record inquiry of each defendant whose representation is potentially conflict-ridden in order to

ascertain whether he or she 'has an awareness of the potential risks involved in that course and

has knowingly chosen it.'" *People v. McDonald*, 68 N.Y.2d 1, 8, 505 N.Y.S.2d 824, 496 N.E.2d

844 (N.Y. 1986) (quoting *People v. Gomberg*, 38 N.Y.2d at 313-314, 379 N.Y.S.2d 769, 342

N.E.2d 550)); *accord People v. Harris*, 99 N.Y.2d 202, 783 N.E.2d 502, 753 N.Y.S.2d 437 (N.Y.

2002).  The failure to make such an inquiry, however, constitutes reversible error "only when

defendant has established the existence, or probable existence, of a conflict of interest, 'which

bears a substantial relation to "the conduct of the defense."' " *Harris*, 99 N.Y.2d at 212 (quoting

*McDonald*, 68 N.Y.2d at 9) (in turn quoting *People v. Lombardo*, 61 N.Y.2d 97, 103, 472

N.Y.S.2d 589, 460 N.E.2d 1074 (N.Y. 1984)).

On the facts of this case, appellate counsel would not have been successful in

demonstrating that the potential conflict bore a "substantial relation" to trial counsel's

representation of Pratt.  In *Harris*, the New York Court of Appeals determined that the record

supported the lower courts' conclusion that "defense counsel's unawareness of the potential

conflict precludes a finding that he was somehow inhibited in single-mindedly pursuing

[defendant]'s best interests during the course of the representation." *Harris*, 99 N.Y.2d at 210-11.

As was the case in *Harris*, Pratt's trial counsel was not apprised of the potential conflict of

interest until the last day of trial. To put it another way, there is nothing in the record to suggest

that had trial counsel realized earlier that he previously had represented a member of the victim's

family and had withdrawn as Pratt's attorney, subsequent counsel would have defended Pratt in

some "more vigorous, less inhibited manner." *Id.* at 211. In light of these precedents, there is no

reasonable probability that a reviewing court presented with this issue would have found that the

potential conflict detrimentally affected trial counsel's representation of Pratt. *See id.* At most,

the state appellate court would have found that the "better practice" was for the trial court to

make some inquiry into the conflict issue raised by trial counsel. *See id.* (citing *Mickens v.

Taylor*, 535 U.S. 162, 122 S. Ct. at 1244-1245). The fact remains, however, that this issue would

-33-

not have garnered Pratt a reversal of his conviction. Because Pratt cannot show that there was a reasonable probability that the outcome of his appeal would have been different had appellate counsel included the duty-to-inquire issue, Pratt cannot demonstrate prejudice. Habeas relief accordingly is not warranted on this claim. *Accord Frazier v. Kelly*, 112 F. Supp.2d 253 (W.D.N.Y. 1999).

> **ii.** **Appellate counsel's conflict of interest due to petitioner's lack of funds**

According to Pratt, appellate counsel "operated under a conflict himself due to petitioner's inability to pay an additional $10,000 for him to prepare a CPL 440.10 motion" which Pratt wanted to pursue after he was unsuccessful in obtaining a reversal of his conviction on direct appeal. Petitioner's Memorandum of Law in Support of Writ of Error *Coram Nobis* at 3. Pratt asserts that when appellate counsel learned that Pratt did not have the funds to pay for the motion, counsel should have moved to be "assigned" as counsel under "County Law § 722-c" [*sic*].[4] *Id.* at 4.  Stated another way, Pratt wished to file a collateral motion to vacate after his conviction was upheld, and counsel asked for more money which Pratt says he did not have. Pratt's pleadings do not suggest that counsel did not do his best because he was not paid enough. Rather, Pratt is saying that counsel should have worked on the motion to vacate as his counsel without retainer by petitioning the court to have himself declared assigned counsel.

Although Pratt has framed this as a conflict-of-interest claim, he in fact appears to be asserting that he was entitled to free legal representation in connection with his collateral motion to vacate the judgment. This claim is without merit. Pratt had no constitutional right under the

---

[4] There is no § 722-c of the County Law; the Court assumes that Pratt is referring to § 722-4 of the County Law since that section deals with the assignment of publicly-reimbursed counsel. *See* N.Y. County Law § 722-4.

federal constitution to have counsel appointed to represent him in connection with a collateral

motion to vacate the judgment pursuant to § 440.10 of New York's Criminal Procedure Law.

*E.g.*, *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987);[5] *accord, e.g., People v. Richardson*, 159

Misc.2d 167, 603 N.Y.S.2d 700 (N.Y. Sup. Ct. 1993) (holding that the federal constitution does

not mandate assignment of counsel in a C.P.L. § 440 motion since it is a post-conviction

collateral proceeding); *People v. Kearney*, 2 Misc.3d 1005, 784 N.Y.S.2d 922 (N.Y. Co. Ct.

2004) (same). Although the New York state constitution and the "right to counsel" rulings issued

by New York state courts construing the state constitution, *e.g., People v. Rogers*, 48 N.Y.2d

167, 422 N.Y.S.2d 18, 397 N.E.2d 709 (N.Y. 1979), are broader than the federal mandates, the

state right to counsel historically expires with the disposition of criminal charges against a

defendant and has not been extended to post-conviction proceedings. *E.g., People v. Colwell*, 65

N.Y.2d 883, 482 N.E.2d 1214, 493 N.Y.S.2d 298 (N.Y. 1985) (holding that defendant's interest

in extending New York's right to counsel rule set forth in *People v. Rogers*, *supra*, throughout

the often-protracted duration of an appeal outweighed by the legitimate interest in law

enforcement; thus, once pending charge had resulted in a conviction and defendant was

represented only for purposes of an appeal, *Rogers* did not preclude questioning on unrelated

charges); *accord People v. Robles*,72 N.Y.2d 689, 533 N.E.2d 240, 536 N.Y.S.2d 401 (N.Y.

1988). It does not appear that the New York Court of Appeals has ruled on the precise issue of

---

[5] "We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, and we decline to so hold today. Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further. Thus, we have rejected suggestions that we establish a right to counsel on discretionary appeals. We think that since a defendant has no federal constitutional right to counsel when pursuing a discretionary appeal on direct review of his conviction, a fortiori, he has no such right when attacking a conviction that has long since become final upon exhaustion of the appellate process." *Finley*, 481 U.S. at 555 (internal citations omitted).

whether New York's constitution requires the appointment of counsel for indigent defendants in a collateral, post-conviction motion to vacate the judgment. However, a number of lower courts have ruled that, based on a textual analysis of the state constitution and the state Criminal Procedure Law, such a right does not exist. *E.g.*, *People v. Richardson*, 159 Misc.2d 167, 603 N.Y.S.2d 700 (N.Y. Sup. Ct. 1993) (in New York, a defendant is entitled to counsel at "every stage of the [criminal] action;" a criminal action terminates after sentence; a C.P.L. § 440.10 post-conviction motion to vacate the judgment is not a "stage of the action"; thus, defendant had no right to appointed counsel in connection with § 440.10 motion); *accord People v. Kearney*, *supra*; *People v. Ramsey*, 2001 WL 1875965, at *1, slip op. 50142 (N.Y. Sup. Ct. Feb. 9, 2001). Finally, County Law § 722-4 to which petitioner apparently refers does not support his argument; that section merely authorizes a court to assign a publicly-reimbursed attorney when an evidentiary hearing on a C.P.L. § 440 motion is ordered. *E.g.*, *People v. Richardson*, *supra*; *see also People v. Dolan*, 8 Misc.3d 555, 796 N.Y.S.2d 218 (N.Y. Co. Ct. 2005) (holding that since defendant was not entitled to a hearing, he likewise was not entitled to appointment of public counsel to represent him on a C.P.L. § 440 motion). This claim therefore is without merit.

## CONCLUSION

For the reasons stated above, Thomas Pratt's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because Pratt has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:     February 9, 2006
           Rochester, New York